UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
ALISON SCOTT, Individually and on Behalf
of All Other Persons Similarly Situated,

                              **MEMORANDUM & ORDER**

          Plaintiffs,             09-CV-4399 (RRM)(VVP)

   - against -

SSP AMERICA, INC.,

          Defendant.
-------------------------------------------------------------X
**ROSLYNN R. MAUSKOPF, United States District Judge.**

In this putative class action, Plaintiff Alison Scott ("Plaintiff") asserts claims under the

Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.*, and New York Labor Law §§ 650

*et seq.*, on behalf of herself and all others similarly situated, against SSP America, Inc.

("Defendant") for unpaid wages and overtime compensation. On August 26, 2010, Defendant

moved for summary judgment as to all of Plaintiff's claims. For the reasons set forth below,

Defendant's motion is GRANTED in its entirety.

## BACKGROUND[1]

Defendant is a provider of food and beverage services in travel locations, offering full

service restaurants, cafes, bars, bakeries, and branded fast food outlets ("Units"). (Def.'s 56.1

---

[1] The following material facts are taken from the Local Rule 56.1 statements submitted by the parties and the affidavits and exhibits submitted in connection with Defendant's Motion for Summary Judgment and Plaintiff's Opposition thereto. The facts are undisputed except as noted. Moreover, unless otherwise noted, citations to the parties' Rule 56.1 statements concern factual assertions that are admitted or are deemed admitted because they were not contradicted by citations to admissible evidence. *See Giannullo v. City of N.Y.*, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted."). Ordinarily, failure to comply with the Local Rules regarding 56.1 Statements would result in the material facts in the non-complying party's Statement being deemed admitted for the purposes of deciding the pending summary judgment motion. *See* Local Civil Rule 56.1(c). A district court, however, "has broad discretion to determine whether to overlook a party's failure to comply with local court rules." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (citations omitted); *see also Rateau v. City of N.Y.*, No. 06-CV-4751 (KAM)(CLP), 2009 U.S. Dist. LEXIS 90112, at *2 n.1 (E.D.N.Y. Sept. 29, 2009) (exercising discretion in reviewing the admissible record evidence in determining whether proposed undisputed facts were disputed). Accordingly, for the purposes of this motion, Defendant's statement of undisputed facts is treated as undisputed only where it is not controverted by admissible evidence in the record.

Stmt. ¶ 1.)  During the time period relevant to this case, Defendant had between thirteen and seventeen Units in Terminal 4 of JFK International Airport ("JFK"), the terminal in which Plaintiff worked.  (*Id.* ¶ 3.)[2]  Each Unit is a separate business operation.  (*Id.* ¶ 4.)  Defendant's operation at JFK is organized according to the following corporate hierarchy:  each Unit is assigned various unionized employees, who are paid by the hour ("hourly employees"), one or more Assistant Managers, who are paid by salary, and one Unit Manager, who also receives a salary.  (*Id.* ¶¶ 5–7, 45.)  The hourly employees include line cooks, cashiers, servers, porters, and bartenders, and "hourly supervisors" in each of these disciplines, and all are supervised by the Unit Manager and Assistant Managers.   (*Id.* ¶ 45.)  The hourly employees, including hourly supervisors, are the only employees within this hierarchy who are eligible for overtime compensation.   The Unit Manager is also responsible for supervising Assistant Managers, and reports both to the Operations Manager and the General Manager.  (*Id.* ¶¶ 5–7.)  The Operations Manager reports to the General Manager, who is the most senior manager in the relevant portion of Defendant's corporate structure.  (*Id.*)

Plaintiff began working for Defendant on February 19, 2007.  (*Id.* ¶ 9.)  Plaintiff was initially hired as an Assistant Manager, and assigned to the Sam Adams and Bar Avion Units at a time when no Unit Manager was responsible for either Unit.  (*Id.* ¶ 10.)  In late 2007, Defendant promoted Plaintiff to Unit Manager and gave her responsibility for the Bar Avion and Shannon's Units on the east side of Terminal 4 at JFK.  (*Id.* ¶ 11.)  Plaintiff then moved to the Sam Adams, Brooklyn Brewery, B23 and B27 Units, where she worked as the sole Unit Manager with at least two Assistant Managers.  (*Id.* ¶ 12.)

In the summer of 2008, Plaintiff decided to take an Assistant Manager position for personal reasons for a brief period of time, and worked at the Brooklyn Brewery, B27 and B23

---

[2] Defendant also had one Unit in Terminal 8 at JFK.  (Kobrynich Dep. at 17.)

Units.  (*Id.* ¶¶ 13–14.)  Plaintiff's responsibilities remained largely the same and her salary was not reduced; however, Plaintiff reported to a Unit Manager and no longer prepared the employees' schedules.  (*Id.* ¶ 15.)  In April 2009, Plaintiff was made Unit Manager for Panda Express, and was sent on a week-long training session in Boston, Massachusetts to learn about the Panda Express franchise.  (*Id.* ¶¶ 16–17.)  Plaintiff held this position until July 30, 2009, when she resigned from her employment with Defendant.  (*Id.* ¶ 18.)

When Plaintiff began working for Defendant, her starting salary was $38,000.  (*Id.* ¶ 19.) She received a raise to $43,000 in March 2008.  (*Id.* ¶ 20.)  Plaintiff's salary was never reduced during her tenure with Defendant, and she was eligible to receive bonuses of up to 15% to 20% of her salary.  (*Id.* ¶¶ 21–22.)  Plaintiff received health benefits different from those offered to hourly employees.  (*Id.* ¶¶ 22–23.)

1. <u>Plaintiff's Responsibilities as Unit Manager</u>

In this action, Plaintiff challenges her compensation as a Unit Manager.  In that capacity, Plaintiff supervised as many as four Units at one time.  (*Id.* ¶ 12.)  Plaintiff testified that she was responsible as a Unit Manager for the following:  (1) ensuring that food and drink stocks were full, (2) meeting the budget or surpassing it, (3) making sure the Unit was clean, (4) handling in-person guest complaints, (5) ensuring that hourly employees were clocking in and out, and (6) checking staffing levels.  (*Id.* ¶ 25.)  Plaintiff also created the employee work schedule with the help of a computer program.  (Def.'s 56.1 Stmt. ¶ 26; Pl.'s 56.1 Cntrstmt. ¶ 26.)  She testified that she "plugged" the names of hourly employees into the computer program, which auto-generated a schedule.  (Pl.'s 56.1 Cntrstmt. ¶ 61.)  She had neither the authority to determine the number of employees who would work each week, nor the power to change the schedules she created with the computer program.  (*Id.* ¶ 26.)  Plaintiff once complained to the General

Manager that she was dismayed because the General Manager had asked someone else to create the schedule, which was Plaintiff's responsibility, and that she would "not feel as if this business belongs to [her] if other people has to [sic] do [her] job nor [would she] be focused on it if everything is taken away from me." (Def.'s 56.1 Stmt. ¶ 39.) Before the responsibility for vacation requests was given to the human resources department, Plaintiff had the authority to grant or deny the vacation requests of hourly employees. (*Id*. ¶ 63.)

Plaintiff testified that her most important managerial "task" was "[i]ncreasing profitability," but that she could not identify her most important "role" as a manager because she "spent so much of [her] time in an hourly position." (Def.'s 56.1 Stmt. ¶ 27; Pl.'s 56.1 Cntrstmt. ¶ 27.) By instructing the hourly employees to up-sell[3] and "controlling the voids,"[4] Plaintiff was able to increase the profitability of her Units and avoid waste. (Def.'s 56.1 Stmt. ¶ 28.) Plaintiff also had the authority to ask for volunteers to go home when the Unit was overstaffed, but she could not order an hourly employee to stop working. (Def.'s 56.1 Stmt. ¶ 29–30; Pl.'s 56.1 Cntrstmt. ¶ 29–30.)

Plaintiff was responsible for tracking her Units' inventories. (Def.'s 56.1 Stmt. ¶ 33.) On a daily basis, Plaintiff ordered food and drink from a storeroom located in the airport, using historical business volume averages and her own familiarity with her Units to order the optimal amount of replacement goods. (Def.'s 56.1 Stmt. ¶ 31–32; Pl.'s 56.1 Cntrstmt. ¶ 31–32.) Plaintiff also enforced corporate regulations regarding portion and food control in the kitchen and bar area. (Def.'s 56.1 Stmt. ¶ 34; Pl.'s 56.1 Cntrstmt. ¶ 34.) Plaintiff did not have the

---

[3] Plaintiff described up-selling in the following way: "When you say up-selling, I would, before the shift start with employees, I would suggest to them hey, you know you can up-sell on something that is of a higher price . . . ." (Scott. Dep. at 120.) In other words, Plaintiff would encourage her staff to suggest to customers that they purchase more expensive items on the menu as a way to increase profits.

[4] Plaintiff explained that "[i]f you saw one particular employee had excessive amount [sic] of voids, you would counsel them on, for instance, why is there enough – so many voids . . . are you working too fast, pressing incorrect items, and stuff like that." (Scott. Dep. at 131–32.)

authority to change the kinds of food served in her Units, or to change food prices.  (Pl. Dep. at 258.)

Each day, Plaintiff and the other Unit Managers attended a "huddle."  (Def.'s 56.1 Stmt. ¶ 35.)  It was permissible for hourly employees to attend the daily huddle if no Unit Managers were available.  (Pl.'s 56.1 Cntrstmt. ¶ 35.)  During these fifteen-to-thirty minute huddles, managers would discuss daily expectations and potential weather disruptions, which could cause flight delays, flight cancellations, and fluctuations in business volume.  (Def.'s 56.1 Stmt. ¶ 36.)  Plaintiff also attended weekly, multi-hour managers' meetings, at which she learned about the operations of the business.  (*Id.* ¶ 37.)

The Operations Manager supervised Plaintiff by periodically sending her e-mails, calling her on the phone, and meeting her face-to-face while walking through the various Units.  (Kobrynich Dep. at 27–28.)  Plaintiff had access to several computers in the Units through which she could send and receive e-mails to and from her supervisors.  (Scott Dep. at 66.)  The General Manager walked around the Units for sixty percent of her time at work.  (Kobrynich Dep. at 24.)  The Operations Manager also walked around the Units eighty percent of the time.  (*Id.* at 19–20.)  The Operations and General Managers walked through fourteen-to-eighteen Units in two separate airport terminals.  (*Id.* at 16–17.)  Plaintiff testified that both the General and Operations Managers had an "open door" policy, and that their offices were located in the same airport terminal in which Plaintiff worked.  (Scott Dep. at 65–66.)

When she was taking over a shift, Plaintiff would hold a pre-shift meeting, wherein she would remind the hourly employees of company standards, including the importance of up-selling and customer friendliness.  (Def.'s 56.1 Stmt. ¶ 40; Pl.'s 56.1 Cntrstmt. ¶ 40.)  Plaintiff also held meetings with her subordinates in which she discussed issues such as "[c]leanliness,

overall feedback, and ideas to put on whatever needs to be done to enhance the business."
(Def.'s 56.1 Stmt. ¶ 41; Pl.'s 56.1 Cntrstmt. ¶ 41.)  Plaintiff was responsible for making sure that
her staff adhered to company standards, as well as administrative health and safety requirements.
(Def.'s 56.1 Stmt. ¶ 42.)  Plaintiff strictly enforced these rules and made certain that the hourly
employees were properly performing their jobs.  (*Id*. ¶ 43.)  Plaintiff was responsible for
informing the hourly employees of their job expectations, and she coached them when they
failed to meet these expectations.  (*Id*. ¶ 44.)  She also supervised Assistant Managers, and
delegated work to them.  (*Id*. ¶ 46.)  Plaintiff completed a performance review of at least one
Assistant Manager, and she provided other employees with both oral and written instructions.
(*Id*. ¶ 47.)

Plaintiff believed that it was necessary to have a manager in the Unit at all times to deal
with any issues that arose, and that not having a manager present would compromise
Defendant's operations.  (*Id*. ¶ 49.)  She could void mistakes made by cashiers and provide
disgruntled customers with free meals or drinks.  (*Id*. ¶ 50.)  Plaintiff also made sure that her
Units were adequately staffed to deal with anticipated business volume, and she often adjusted
staff levels in accordance with flight schedules.  (*Id*. ¶ 62.)  She also had the authority to ask
employees to come to work when her Units were understaffed or to ask them to fill in for hourly
employees who were approaching the overtime threshold.  (*Id*. ¶¶ 64–65.)  Before allowing an
employee to work overtime, however, Plaintiff would have to get the General Manager's
approval.  (*Id*. ¶ 65.)

Plaintiff disciplined hourly employees without the need for supervisory approval, and in
one case she disciplined an Assistant Manager without the advance approval of the General
Manager.  (*Id*. ¶¶ 52–53; Pl.'s 56.1 Cntrstmt. ¶¶ 52–53.)  Normally, however, Plaintiff needed

the General Manager's approval before disciplining an Assistant Manager. (Pl.'s 56.1 Cntrstmt. ¶ 52.) Defendant had a progressive disciplinary system, whereby employees would receive verbal, written, and final warnings, which provided the just cause for termination required by the hourly employees' collective bargaining agreement. (Def.'s 56.1 Stmt. ¶ 54.) Plaintiff would memorialize employee discipline in counseling forms, which stated the basis for the discipline and whether it was a verbal, written, or final warning. (*Id.* ¶ 55.) Plaintiff also had the authority to suspend employees, but she needed the prior approval of either the Operations or General Managers, except under unusual or dangerous circumstances. (Def.'s 56.1 Stmt. ¶¶ 56–59; Pl.'s 56.1 Cntrstmt. ¶¶ 56–59.) According to the hourly employees' collective bargaining agreement, suspension with intent to terminate was the most severe action that management could take against a union employee prior to an investigation with union involvement. (Def.'s 56.1 Stmt. ¶ 60.) Plaintiff believed that managers, such as herself, and hourly employees should never socialize because friendships could make it difficult for managers to discipline hourly employees. (*Id.* ¶ 48.)

Plaintiff's own testimony as to whether she interviewed and hired employees was inconsistent. First, when asked if she hired one employee, Plaintiff answered, "I believe I interviewed her, yes." (Def.'s 56.1 Stmt. ¶ 66.) Later, Plaintiff testified that she never engaged in interviews. (*Id.*) Plaintiff also testified that she did not directly hire employees, but that, rather, she would request additional employees from the human resources department, which was responsible for the actual hiring of employees. (*Id.* ¶ 67; Pl.'s 56.1 Cntrstmt. ¶ 67.)[5] Plaintiff also recommended individuals for promotion, but did not have the authority to award promotions. (Def.'s 56.1 Stmt. ¶ 71; Pl.'s 56.1 Cntrstmt. ¶ 71.) Plaintiff's supervisor testified

---

[5] The General Manager, however, testified that Unit Managers did, in fact, make hiring decisions. (Def.'s 56.1 Stmt. ¶ 68.) In addition, two employees remembered being interviewed and hired by Plaintiff, and two SSP managers claim to have been involved in interviewing and recommending employees for hire. (*Id.* ¶¶ 69–70.)

that at least three individuals were hired based on Plaintiff's recommendations. (*Id.*) Plaintiff also conducted performance reviews of Assistant Managers, which were considered as part of pay raise determinations. (Def.'s 56.1 Stmt. ¶ 72.)

When the airport was crowded or an employee did not report for a scheduled shift, Plaintiff would have to fill in for that employee and perform manual tasks, such as cooking, cleaning, and working the cash register. (*Id.* ¶ 75.) No one scheduled or directed Plaintiff to perform such work. (*Id.* ¶ 76; Pl.'s 56.1 Cntrstmt. ¶ 76.) She testified that she spent approximately 90% of her time performing the work of hourly employees because her Units were often short-staffed. [6] (Pl.'s 56.1 Cntrstmt. ¶ 76.) No one directly supervised Plaintiff's performance while she performed manual tasks, but she was always subject to the general supervision of the Operations and General Managers. (Def.'s 56.1 Stmt. ¶ 77; Pl.'s 56.1 Cntrstmt. ¶ 77.) Plaintiff acknowledged that she would have to stop performing such manual tasks in one Unit in order to check on her other Units. (Def.'s 56.1 Stmt. ¶ 78; Pl.'s 56.1 Cntrstmt. ¶ 78.) Plaintiff testified that even when she was performing manual tasks, she continued to supervise the staff: as she explained, she would "multi task." (Def.'s 56.1 Stmt. ¶ 80.) The collective bargaining agreement provided that managers could perform the work of hourly employees only for "short interval meal period customer surges." (*Id*.)

Plaintiff was eligible for a bonus, which depended, in part, on the success of her Units. (Def.'s 56.1 Stmt. ¶ 86; Pl.'s 56.1 Cntrstmt. ¶ 86.) Plaintiff was held accountable when her Units failed to comply with company standards and administrative regulations. (Def.'s 56.1 Stmt. ¶ 87.) In one case, Panda Express failed an inspection and the General Manager required Plaintiff to come in on her day off and to develop an action plan to remedy the problem. (*Id.* ¶¶ 87–88.)

---

[6] Various employees of Defendant submitted sworn affidavits questioning whether Plaintiff performed as much manual work as she claims. (Def.'s 56.1 Stmt. ¶ 80)

Indeed, Plaintiff held herself accountable for failing the inspection. (*Id.* ¶ 88.) On July 30, 2009, Plaintiff received a write-up because a cook in one of her Units was using a product that did not meet quality standards, and her Unit failed to meet company standards of cleanliness. (*Id.* ¶ 89.) Plaintiff refused to sign the form and resigned from her employment with Defendant later that day. (*Id.* ¶ 90–91.)

## STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings, depositions, interrogatories, admissions, and affidavits demonstrate that there are no genuine issues of material fact in dispute and that one party is entitled to judgment as a matter of law. *See* Fed. R. Civ. R 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a summary judgment motion, a district court must draw all reasonable inferences in favor of the nonmoving party. *See id.* at 249 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)); *Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc.*, 150 F.3d 132, 137 (2d Cir. 1998). Thus, the court must not "weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2007) (quoting *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996)). Any evidence in the record of any material fact from which an inference could be drawn in favor of the non-moving party precludes summary judgment. *See Castle Rock Entm't*, 150 F.3d at 137.

Once the movant has demonstrated that no genuine issue of material fact exists, such that it is entitled to judgment as a matter of law, then "the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis in original). However, there must exist more than mere "metaphysical doubt as to the material facts" to defeat a summary judgment motion. *Id.* at 586. Instead, the non-moving party must present "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson*, 477 U.S. at 256. Only disputes over material facts "that might affect the outcome of the suit under the governing law" will properly preclude the entry of summary judgment. *Id.* at 248; *see also Matsushita*, 475 U.S. at 586.

## **DISCUSSION**

Both New York and federal wage law require employees working more than forty hours per week to be compensated for overtime work at a rate of one-and-a-half times their standard rate, 29 U.S.C. § 207(a)(1); N.Y. Labor Law §§ 650 *et seq.*; N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.2 (expressly adopting the provisions and exemptions of the federal Fair Labor Standards Act of 1938, 29 U.S.C. §§ 201 *et seq.*), *see also Kahn v. Superior Chicken & Ribs, Inc.*, 331 F. Supp. 2d 115, 117 (E.D.N.Y. 2004). However, both provide statutory exemptions for employees properly classified as "bona fide executives." *See* 29 U.S.C. § 213(a)(1); N.Y. Labor Law § 651(5)(c).[7] Since this exemption provides an affirmative defense to overtime claims, the employer has the burden of proving that a plaintiff is an exempt "bona fide

---

[7] Because New York's overtime provisions mirror and/or expressly adopt federal wage law (*see, e.g.*, N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.2) federal courts evaluate New York's executive exemption by reference to the Fair Labor Standards Act of 1938, 29 U.S.C. §§ 201 *et seq.*, and its attendant regulations, set forth in the Code of Federal Regulations. *Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 78 (2d Cir. 2003); *see, e.g.*, *Kahn*, 331 F. Supp. 2d at 117 n.1; *Torres v. Gristede's Operating Corp.*, 628 F. Supp. 2d 447, 456 (S.D.N.Y. 2008) ("New York's overtime provisions expressly incorporate the FLSA exemptions.") Both parties agree that the standards applicable to Plaintiff's state law claim are the same as those governing her FLSA claim.

executive" by a preponderance of the evidence.  *Bilyou v. Dutchess Beer Distribs., Inc.*, 300 F. 3d 217, 222 (2d Cir. 2002); *see also Martin v. Malcolm Pirnie, Inc.,* 949 F.2d 611, 614 (2d Cir. 1991); *Khan v. IBI Armored Servs.*, 474 F. Supp. 2d 448, 456 (E.D.N.Y. 2007) ("[i]n an action brought to compel the payment of overtime compensation, the employer must by a preponderance of the evidence make a clear showing of exemption" (citation omitted)). Moreover, because the FLSA is remedial in nature, its exemptions are construed narrowly against the employer.  *See Kahn*, 331 F. Supp. 2d at 117.

The determination of whether an employee is exempt from the overtime requirements of the FLSA is a "highly fact intensive inquiry that must be made on a case-by-case basis in light of the totality of the circumstances."  *Johnson v. Big Lots Stores, Inc.*, 604 F. Supp. 2d 903, 908 (E.D. La. 2009) (citations omitted); *see also Barfield v. N.Y. City Health and Hosps. Corp.*, 537 F.3d 132, 141–42 (2d Cir. 2008) ("employment for FLSA purposes [is] a flexible concept to be determined on a case-by-case basis by review of the totality of the circumstances" (citation omitted)).  "[D]isputes regarding the nature of an employee's duties are questions of fact." *Indergit v. Rite Aid Corp.*, No. 08-CV-11364 (PGG), 2010 U.S. Dist. LEXIS 32322, at *14–15 (S.D.N.Y. Mar. 31, 2010) (citation and internal quotation marks omitted); *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986) ("The question of how the respondents spent their working time . . . is a question of fact.")).

Once the scope of an employee's duties is established, however, "[t]he question whether their particular activities excluded them from the overtime benefits of the FLSA is a question of law . . . ."  *Icicle Seafoods, Inc.*, 475 U.S. at 714.  Accordingly, summary judgment can be appropriate when the parties agree on the scope of the plaintiff's duties or, when such facts are disputed, the Court accepts the plaintiff's version as true, but the parties disagree about whether

those duties entitle the defendant to claim an exemption under the FLSA. *See Mullins v. City of N.Y.*, 523 F. Supp. 2d 339, 353 (S.D.N.Y. 2007).

Congress did not define the "bona fide executive" exemption in the FLSA, but rather delegated this responsibility to the Department of Labor. 29 U.S.C. § 213(a)(1). In 2004, the Secretary of Labor revised its regulations to define "executive" as any employee:

> (1) [c]ompensated on a salary basis at a rate of not less than $ 455 per week;
>
> (2) [w]hose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department of subdivision thereof;
>
> (3) [w]ho customarily and regularly directs the work of two or more other employees; and
>
> (4) [w]ho has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

29 C.F.R. § 541.100(a) (2004). "A job title alone is insufficient to establish the exempt status of an employee." *Id.* § 541.2.

Here, the parties do not dispute that Plaintiff received a salary in excess of the amount required under the FLSA and New York state law, and that she customarily and regularly directed the work of two or more employees. Rather, the dispute between the parties centers on whether Plaintiff's "primary duty" was management of the enterprise and what role, if any, she had in the hiring, firing, promotion, or demotion of other employees. This Court will consider each issue in turn.

    1. <u>Primary Duty</u>

Department of Labor regulations define "primary duty" as "the principal, main, major or most important duty that the employee performs." *Id.* § 541.700(a). The regulations provide

that the following, non-exclusive list of factors should be considered in determining whether an employee's primary duty is management: (1) the relative importance of an employee's exempt duties as compared with other types of duties; (2) the amount of time spent performing exempt work; (3) the employee's relative freedom from direct supervision; and (4) the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee. *Id.* "The time an employee spends performing exempt work is an in important but non-determinative factor in determining an employee's primary duty." *Ruggles v. Wellpoint, Inc.*, No. 08-CV-0201(LEK), 2011 U.S. Dist. LEXIS 17310, at *20 (N.D.N.Y Feb. 22, 2011) (citing 29 C.F.R. § 541.700(b) ("Time alone, however, is not the sole test, and nothing in this section requires that exempt employees spend more than 50 percent of their time performing exempt work.")). The regulations also define management as activities including, but not limited to:

> interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

*Id.* § 541.102.

The evidence in the record, even drawing all evidence in Plaintiff's favor, as required, demonstrates that her managerial duties were more important to the success of Defendant's business than other duties she performed during the course of her employment. Plaintiff testified in her deposition that she was responsible for and did, in fact, carry out a significant number of managerial responsibilities involving as many as four Units at once:

> ensuring that her Units were fully stocked with food and drink; meeting her Units' budgets or surpassing them; making sure her Units were clean and compliant with health and safety regulations; enforcing corporate regulations for portion and food control in the kitchen and bar areas of her Units; handling in-person guest complaints; monitoring the clocking in and clocking out of hourly employees; ensuring adequate staffing levels; requesting employees to come in when her Units were understaffed; asking employees to fill in for hourly employees approaching the overtime threshold creating the employee work schedule; attending daily manager "huddles" and weekly, multi-hour manager meetings; informing hourly employees of job expectations and coaching those who failed to meet them; supervising Assistant Managers and delegating work to them and providing them with performance reviews which were used as part of pay raise determinations; training employees at Panda Express;[8]; resolving problems in her Units and preventing their recurrence; voiding cashier mistakes; ensuring that employees were not requesting an excessive number of voids; granting or denying hourly employee vacation requests before the responsibility was given to human resources; disciplining hourly employees; disciplining an Assistant Manager without approval or direction of her supervisors; suspending employees with advanced approval of her supervisors, and suspending employees without advanced approval in extreme or dangerous cases; requesting additional employees from the human resources department; instructing her employees to engage in up-selling; developing merchandise ideas; keeping her supervisors abreast of any issues that arose in her Units; and serving as an effective leader of her Units to build a successful team

The importance of these duties, especially when considered together, is without question quite considerable.

The Court must next consider the importance of these managerial duties as compared with the significance of Plaintiff's other duties. In her deposition, Plaintiff testified that when

---

[8] After testifying that she trained Panda Express employees, Plaintiff generally denied providing any training to her staff. (Scott Dep. at 86, 127.)

business at her Units would pick up, her units were often short-staffed, and that her requests for additional employees would fall on "deaf ear[s]." (Scott. Dep. at 254–55.) Since she did not believe it was fair "as a manager" to watch "the employees . . . work twice as hard," she felt it incumbent upon herself to pitch in and help the hourly employees. (*Id.* at 254.) Although Plaintiff testified that she spent on average 90% of her time performing the nonexempt tasks of hourly workers, such as working the cash register, she continued to supervise her subordinates by "multi task[ing]." (Scott. Dep. at 235, 237.)[9] Defendant has submitted numerous affidavits from Plaintiff's former co-workers suggesting that she spent far less than 90% of her time performing nonexempt tasks. As this is a motion for summary judgment, however, Plaintiff is entitled to the inference that she did, in fact, perform non-exempt tasks 90% of the time, even as she concurrently supervised her staff.[10] Even crediting Plaintiff's testimony, as discussed below, it is clear that Plaintiff's management duties were more important to the success of Defendant's business than her other duties. *See Dalheim v. KDFW-TV*, 918 F.2d 1220, 1227 (5th Cir. 1990) (explaining that an "employee's primary duty will usually be what she does that is of principal value to the employer, not the collateral tasks that she may also perform, even if they consume more than half her time").

---

[9] In her 56.1 Counterstatement, Plaintiff attempts to argue that she meant only that she "would multi-task more than one menial, non-exempt task at a time." (Pl.'s 56.1 Cntrstmt. ¶ 80.) However, Plaintiff's deposition testimony is crystal clear – she testified that she did not cease supervising her staff when she would perform manual labor. (Scott Dep. at 235 ("Q: While you were doing work of cleaning or cooking or cashiering, who was supervising the staff? A. I had to multi task.")). This Court will not permit Plaintiff to cloud the plain meaning of her own admissions with attorney argument and obfuscation.

[10] Two SSP employees submitted affidavits stating that even when Plaintiff performed manual tasks, she was still acting as a manager. (Cineus Decl. ¶ 4; Acevedo Decl. ¶ 4.) Other SSP Unit Managers also submitted affidavits indicating that they concurrently supervise and perform manual work. (Auguste Decl. ¶ 10; Rodriguez Decl. ¶ 10; Gaffor Decl. ¶ 9.) As these statements do not contradict Plaintiff's own deposition testimony, the Court considers them as part of the record's undisputed facts.

In *Donovan v. Burger King Corp.*, the Second Circuit held that although managers spent at least half their time on nonexempt, manual work, their managerial responsibilities were the "most important or critical to the success of the restaurant":

> [I]t is clear that the restaurants could not operate successfully unless the managerial functions of Assistant Managers, such as determining amounts of food to be prepared, running cash checks, scheduling employees, keeping track of inventory, and assigning employees to particular jobs, were performed. For that reason, *as well as the fact that much of the oversight of the operation can be carried out simultaneously with the performance of non-exempt work*, we believe the principal or most important work of these employees is managerial.

675 F.2d 516, 521 (2d Cir. 1982) (emphasis added). The same is true here. Even when all reasonable inferences are drawn in Plaintiff's favor, it is clear from her deposition admissions that the success of Defendant's business was more dependent on Plaintiff's management duties than her other duties, the performance of which did not prevent her from continuing to manage her Units. Of course, had she chosen not to help her overworked subordinates, there is no doubt that Defendant's business would have been less efficient and, perhaps, less profitable. If, however, Plaintiff failed to perform her managerial duties, such as ordering replacement food and drink for her Units, making the employee schedule, voiding cashier mistakes, and supervising, disciplining, and coaching her staff, "[Plaintiff's Units] would not function at all because no one else would perform these essential tasks." *Thomas v. Speedway SuperAm., LLC*, 506 F.3d 496, 505 (6th Cir. 2007) (finding that plaintiff's managerial duties, including hiring employees, training employees, and assigning the weekly work schedule, were more important than her other duties, which included stocking merchandise, sweeping floors, and cleaning bathrooms); *see also Jones v. VA. Oil Co.*, 69 F. App'x 633, 635, 638 (4th Cir. July 23, 2003) (affirming summary judgment dismissal where convenience store manager who "spent approximately 75–80 percent of her time carrying out basic line-worker tasks" was a bona fide

executive whose primary duty was management because "the Dairy Queen could not have operated successfully unless [the plaintiff] performed her managerial functions, such as ordering inventory, hiring, training, and scheduling employees, and completing the daily paper-work"); *Guinup v. Petr-All Petroleum Consulting Corp.*, No. 07-CV-1120 (GTS), 2010 U.S. Dist. LEXIS 86280, at *22 (N.D.N.Y Aug. 23, 2010) ("In other words, while Store 360 could have operated – albeit poorly – if Plaintiff did not perform her non-managerial duties, Store 360 could not have operated successfully unless Plaintiff performed her managerial functions, such as hiring, training, and scheduling employees, completing the daily paper-work, and regularly reporting various day-to-day issues to corporate.").

The importance of managerial oversight to the overall success of this business operation is further supported by Plaintiff's testimony that she disciplined an Assistant Manager, one of her subordinates, for compromising a Unit's operation by not notifying Plaintiff before leaving for the day:

> Q.   How did not notifying you compromise the operation?
> A.   There was no manager there.  If an issue arise [sic], there was no one there to take care of it.  If an employee needed a void or a customer, you know, needed to see a manager for whatever reason, there was no manager there.
> Q.   So a manager should always be on the premises?
> A.   Right.

(Scott. Dep. at 178.)

Moreover, Plaintiff had the authority to decide when, and whether, to begin and stop performing manual tasks, which represents the kind of discretion only managers possess.  The FLSA's regulations provide guidance for the impact of discretion on this analysis:

17

> Generally, exempt executives make the decision regarding when to perform nonexempt duties and remain responsible for the success or failure of business operations under their management while performing the nonexempt work. In contrast, the nonexempt employee generally is directed by a supervisor to perform the exempt work or performs the exempt work for defined time periods.

29 C.F.R. § 541.106(a). This example closely tracks Plaintiff's own description of the circumstances under which she performed nonexempt, manual work. Specifically, Plaintiff testified that she (1) was not directed by a supervisor to perform nonexempt work, such cooking or cleaning; (2) performed this work out of a sense of duty to prevent the hourly employees from being overworked; (3) periodically stopped performing nonexempt work in one Unit so that she could check on her other Units; (4) was not directly supervised while she performed nonexempt work; (5) continued concurrently to supervise the hourly employees by "multi tasking"; (6) was held responsible for the failure of her Units; (7) considered it important to feel like the "business belong[ed] to [her]"; and (8) believed that "increasing profitability" of her Units was her most important managerial task.

In sum, it is clear from the undisputed facts in the record, as well as Plaintiff's deposition testimony, that her principal value to Defendant's business was the management of her Units, even though she engaged concurrently in a substantial amount of nonexempt work.

### b. The Amount of Time Spent Performing Exempt Work

Plaintiff testified that she spent 90% of her time on nonexempt work, an inference to which she is entitled on summary judgment.[11] In deciding an employee's primary duty, although the percentage of time spent performing nonexempt work is an important consideration, it is not

---

[11] As noted above, Defendant submitted affidavits of SSP employees who worked with Plaintiff, stating that she performed nonexempt work for a much lower percentage of time than she claims. However, this Court accepts as true for purposes of this motion that Plaintiff engaged in nonexempt work ninety percent of the time because "[i]t is a settled rule that credibility assessments, choices between conflicting versions of events, and the weighing of evidence are matters for the jury, not the court on a motion for summary judgment." *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (citation and internal quotation marks omitted).

dispositive, "particularly when non-management duties are performed simultaneous to the supervision of employees or other management tasks and other factors support a finding that the employee's primary duty is managerial." *Jones v. Va. Oil Co.*, 69 Fed. App'x 633, 637 (4th Cir. 2003) (citation and internal quotation marks omitted) (affirming district court grant of summary judgment where plaintiff claimed she spent "75–80 percent of her time carrying out basic line-worker tasks" because she "could simultaneously perform many of her management tasks"); *see also Jackson v. Advance Auto Parts, Inc.*, 362 F. Supp. 2d 1323, 1328, 1335 (N.D. Ga. 2005) (granting summary judgment to defendant despite plaintiffs' testimony that they spent 90% of their time performing manual, non-exempt work because "[p]laintiffs acknowledged at their depositions that while they were selling to customers, operating the register, or performing other incidental tasks, they were also still overseeing the other employees in the store and making sure that the store was operating properly"). Indeed, the FLSA regulations specifically state that:

> an assistant manager in a retail establishment may perform work such as serving customers, cooking food, stocking shelves and cleaning the establishment, but performance of such nonexempt work does not preclude the exemption if the assistant manager's primary duty is management. *An assistant manager can supervise employees and serve customers at the same time without losing the exemption. An exempt employee can also simultaneously direct the work of other employees and stock shelves.*

29 C.F.R. § 541.106 (emphasis added).

Here, Plaintiff testified that she continued to supervise employees while she performed nonexempt work: when asked "who was supervising the staff" while she performed nonexempt work, Plaintiff responded, "I had to multi task." (Pl. Dep. at 235.) [12] "[O]ne can still be 'managing' if one is in charge, even while physically doing something else," and, in such

---

[12] Plaintiff's admission is confirmed by affidavits submitted by Defendant from Plaintiff's former employees stating that she continued to supervise the staff while she performed manual tasks, (Cineus Decl. ¶ 4; Acevedo Decl. ¶ 4.), as well as affidavits submitted by other SSP Unit Managers, who stated that they concurrently supervised and performed manual work. (August Decl. ¶ 10; Rodriguez Decl. ¶ 10; Gaffor Decl. ¶ 9.)

situations, "where the employee's management and non-management functions are [not] clearly severable," the amount of time a plaintiff spent performing exempt work is not accorded much weight. *Donovan v. Burger King Corp.*, 672 F.2d 221, 226 (1st Cir. 1982) *see also Baldwin v. Trailer Inns, Inc.*, 266 F.3d 1104, 1113–14 (9th Cir. 2001) (affirming district court grant of summary judgment for employer where plaintiffs "spent ninety percent of their time on nonexempt tasks," holding that "[w]e do not presume that the executive exemption fails merely because the proportion of time spent on exempt managerial tasks is less than fifty percent, where, as here, managerial duties are packaged in employment with non-managerial tasks, and the management function cannot readily and economically be separated from the nonexempt tasks" (citations omitted)); *Donovan v. Burger King Corp.*, 675 F.2d 516, 521 (2d Cir. 1982) (although plaintiff performed nonexempt tasks more than fifty percent of the time, management was still primary duty, in part because "much of the oversight of the operation can be carried out simultaneously with the performance of non-exempt work"); *Mullins v. City of N.Y.*, 523 F. Supp. 2d 339, 357 (S.D.N.Y. 2007) ("[T]he fact that plaintiffs spend most of their shifts working alongside their subordinates and performing many of the same law enforcement tasks does not, in itself, dispose of the primary duty inquiry. Indeed, courts have found parties to be exempt executives even when they spend up to ninety percent of their time performing non-exempt tasks." (citing *Baldwin*, 266 F.3d at 1113–14)). In light of Plaintiff's admission that she performed nonexempt and exempt work concurrently, this Court finds that this factor weighs neither in favor nor against finding that Plaintiff's primary duty was management.

c.  *Plaintiff's Relative Freedom From Direct Supervision and Exercise of Discretionary Authority[13]*

The undisputed evidence in the record demonstrates that Plaintiff exercised extensive discretionary authority on a regular basis.  Plaintiff was the lone Unit Manager for as many as four different Units at one time, and was solely responsible for deciding how to allocate her time between supervising each Unit.  Plaintiff used her knowledge of Defendant's business to decide whether to depart from historical averages when ordering food and drink for her Units.  She also chose when and how to assist hourly employees with nonexempt work.  Indeed, Plaintiff had to use good judgment regularly, including when deciding how much work to delegate to her Assistant Managers; disciplining hourly employees; enforcing company standards and administrative regulations; choosing not to socialize with hourly employees to prevent conflicts in the disciplinary process; making "judgment call[s]" to suspend employees without prior approval in extenuating circumstances (Scott Dep. at 208, 219); recommending suspensions of employees to her supervisors; interviewing at least one person; asking the human resources department for additional employees; recommending individuals for promotion; finding ways to meet her budget or surpass it; handling customer complaints; providing disgruntled customers with complimentary food and drink; coming up with an action plan to deal with a failed Unit inspection; counting cash and transporting it to and from the Units to the safe (Scott Dep. at 138); choosing each day's product sample (Scott Dep. at 122); determining staffing needs based on flight levels; and striking agreements with other Unit Managers to move employees between their respective Units (Scott Dep. at 233).  In fact, Plaintiff instructed an Assistant Manager, one

---

[13] Unlike New York's wage regulations (2 N.Y. Comp. Codes R. & Regs. Tit. 12, § 142-2.14(c)(4)(i)(d)) and prior federal regulations (29 C.F.R. 541.103), the 2004 amendments to the FLSA's regulations (*see*, 29 C.F.R. 451.700(a)) no longer identify discretion in decision-making as a distinct consideration, as such element is often considered "part and parcel" of whether an employee enjoys freedom from direct supervision.  *See Johnson v. Big Lots Stores, Inc.*, 604 F. Supp. 2d 903, 917 (E.D. La. 2009).

of her subordinates, to use more of *her* own judgment when ordering food and drink for the Units. (Scott Dep. at 156–57.)[14] These responsibilities are far from insignificant; for instance, one of the most important drivers of a Unit's profitability is whether the Unit Manager successfully minimizes waste by using good judgment to order the optimal amount of replacement food and drink each week. (Kobrynich Dep. at 100.)

Plaintiff argues that her discretionary authority was highly circumscribed by the constant supervision of her two supervisors and SSP corporate policies. In support of this position, Plaintiff points principally to the fact that the General Manager (two corporate levels above Plaintiff) spent at least 60% of her time walking through the Units, and that the Operations Manager (one level above) spent 80% of his time in the Units. It is necessary, however, to put these time approximations into context. These managers visited between fourteen and eighteen Units in two separate airport terminals throughout the day. As Defendant notes, assuming the Operations Manager worked ten-hour days, "eight would have been spent visiting Units. Ignoring the substantial walking time required for this task, the Operations Manager would still have spent only twenty-five to thirty-five minutes per day at each unit." (Def. Rep. Mem. at 7 n.9.) As her managers were present in her Units only for short periods each day, and Plaintiff herself was also traveling between and supervising up to four Units at once, it is unreasonable to infer from these facts that Plaintiff was subject to the constant supervision she professes to have experienced.

More to the point, this factor measures only the employee's "*relative* freedom from supervision," and there is no evidence in the record indicating that Plaintiff's supervisors micromanaged her, or otherwise infringed on her discretionary authority to make the choices

---

[14] Plaintiff also gave a performance review an Assistant Manager, her own subordinate, in which she suggested that Assistant Manager make an effort to "[t]rust [her] judgment on any decision which she has made and being accountable for it . . . ." (Scott Dep. at 158.)

listed above.  *Thomas v. Speedway SuperAmerica, LLC*, 506 F.3d 496, 507 (6th Cir. 2007) (emphasis in original) (explaining that this factor "does not demand complete freedom from supervision, such that she is answerable to no one, as this would disqualify all but the chief executive officer from satisfying this factor of the primary duty inquiry"); *see also Jones v. Va. Oil Co., Inc.*, 69 Fed. App'x 633, 638 (4th Cir. 2003) ("But while [plaintiff's supervisor] stopped by the store on a regular basis and sometimes helped [plaintiff] out with management tasks when the store was understaffed, the record does not reflect that upper management heavily supervised [plaintiff's] work.  Rather, [plaintiff] was usually the senior-most person on the job site."). Indeed, when her Unit failed a health code inspection, Plaintiff was held responsible by the General Manager, who required her to come up with an action plan to remedy the problem.  This lends further support to the notion that Plaintiff's supervisors considered her the primary, day-to-day supervisor of her Units.

Plaintiff points to a manager's checklist, which the General Manager directed her to create, as support for her argument that her discretion was limited by corporate policies.  (Pl.'s 56.1 Cntrstmt. ¶ 25; Scott Dep. at 108.)  However, the "existence of [a manager's] checklist[] to monitor [Plaintiff's] work does not alter [this Court's] conclusion" that Plaintiff's primary duty was management.  *Baldwin v. Trailer Inns, Inc.*, 266 F.3d 1104, 1115 (9th Cir. 2001) (citation omitted).  This checklist laid out many of Plaintiff's managerial responsibilities in order of importance, but it did not infringe on her discretion to execute those responsibilities by providing, for example, step-by-step instructions.  Even had this checklist or other corporate policies constrained Plaintiff's discretion to a degree, the uncontroverted evidence regarding the significant number of managerial tasks for which Plaintiff was responsible and did, in fact, carry out clearly demonstrates that Plaintiff exercised sufficient discretion for an employee who had

management as her primary duty.  *See Donovan v. Burger King Corp.*, 675 F.2d 516, 521–522

(2d Cir. 1982) ("The exercise of discretion, however, even where circumscribed by prior

instruction, is as critical to that success as adherence to 'the book.'  Burger King, of course,

seeks to limit likely mistakes in judgment by issuing detailed guidelines, but judgments must still

be made."); *Donovan v. Burger King Corp.*, 672 F.2d 221, 226 (1st Cir. 1982) (finding that the

primary duty of assistant managers was management even though their tasks were "governed by

highly detailed, step-by-step instructions contained in" the company manual that "admit of little

or no variation").  As only one of many examples, it was Plaintiff's responsibility as a supervisor

to ensure that her staff complied with corporate policies and administrative regulations, a critical

managerial duty.  *Id.* ("Ensuring that company policies are carried out constitutes the very

essence of supervisory work." (citations and internal quotation marks omitted)).

Plaintiff also emphasizes that the Operations and General Managers closely reviewed

inventory and sales figures, controlled pay raises, and monitored the weekly payroll.  However,

the fact that Plaintiff's supervisors had different, broader, and more important managerial duties

represents a hierarchical division of labor, rather than the sort of hands-on, exacting supervision

that would constrain her ability to exercise discretion.  *Mullins v. City of N.Y.*, 523 F. Supp. 2d

339, 359 (S.D.N.Y. 2007) (explaining that "the presence of a hierarchical structure does not

negate the supervisory nature of work performed at [each of the] various levels" of a business

enterprise (citations an internal quotation marks omitted)).  Although Plaintiff had to seek

advance approval from the Operations and General Managers before taking certain actions, such

as allowing employees to work overtime and suspending employees,[15] "there is often a hierarchy

in any organization wherein supervisors have persons to whom they must report, and the fact that

---

[15] As noted previously, Plaintiff did have the authority to suspended employees without advance approval in extreme
or dangerous circumstances.

an individual does not have final supervisory authority does not take that person out of the realm of being a manager in the organization." *Gellhaus v. Wal-Mart Stores, Inc.*, No. 10-CV-123 (MAC), 2011 U.S. Dist. LEXIS 25582, at *27 (E.D. Tex. Mar. 10, 2011); *see also Jackson v. Advance Auto Parts, Inc.*, 362 F. Supp. 2d 1323, 1335 (N.D. Ga. 2005) ("the fact that Plaintiffs had to adhere to certain guidelines or in certain instances obtain the Store Manager's approval does not diminish Plaintiffs' discretionary powers." (citing *Donovan v. Burger King Corp.*, 675 F.2d 516, 521–22 (2nd Cir. 1982) ("The exercise of discretion . . . even when circumscribed by prior instruction, is as critical to [Burger King's] success as adherence to 'the book.'  Burger King, of course, seeks to limit likely mistakes in judgment by issuing detailed guidelines, but judgments must still be made.")); *Kastor v. Sam's Wholesale Club*, 131 F. Supp. 2d 862, 867 (N.D. Tex. 2001) ("If final decision-making authority were the test for determining whether a person was an executive or administrative employee, one would rarely, if ever, qualify as such an employee under the regulations.").

Finally, although Plaintiff also testified that the Operations and General Managers had an "open door" policy, "[b]eing available for advice is in no sense the exercise of supervision." *Donovan v. Burger King Corp.*, 675 F.2d 516, 522 (2d Cir. 1982); *see also Thomas v. Speedway SuperAmerica*, LLC, 506 F.3d 496, 508 (6th Cir. 2007) (where district manager supervises ten-to-twelve stores, her "availability 'by phone does not detract in any substantial way' from a finding that the store manager was relatively free from supervision" (quoting *Donovan v. Burger King Corp.*, 675 F.2d 516, 522 (2d Cir. 1982)).  As discussed above, Plaintiff had to exercise discretion on a continuing basis throughout the day as she dealt with all manner of unforeseen issues and tasks requiring the exercise of judgment.

In sum, this Court concludes that when the factors germane to determining an employee's primary duty are applied to the undisputed facts of this case, much of it coming from Plaintiff's own testimony, it is clear as a matter of law that her primary duty was management.[16]

## 2. Authority to Hire and Fire or Suggestions Given Particular Weight

The final prong of the executive exemption test is whether Plaintiff was an employee who had "the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees [were] given particular weight." 29 C.F.R. § 541.100. "An employee's suggestions and recommendations may still be deemed to have 'particular weight' even if a higher level manager's recommendation has more importance and even if the employee does not have authority to make the ultimate decision as to the employee's change in status." *Id.* § 541.105.

Here, the undisputed facts and Plaintiff's own deposition testimony demonstrate that, at the very least, Plaintiff's recommendations played a vital role in the hiring, firing, advancement and demotion of Defendant's employees. It is undisputed that Plaintiff had the authority unilaterally to requisition employees from the human resources department when she determined that her Units required additional employees. Plaintiff's testimony about whether she personally interviewed and hired employees is inconsistent; after stating that she interviewed and hired an

---

[16] Neither party discusses the fourth and final factor of the primary duty test – the relationship between the employee's salary and the wages paid to nonexempt employees performing similar work. Accordingly, this Court accords this factor no weight in determining that Plaintiff's primary duty was management. *See Jackson v. Jean Coutu Group (PJC) USA, Inc.*, No. 06-CV-194 (LGW), 2007 U.S. Dist. LEXIS 46305, at *12–13 (S.D. Ga. June 26, 2007) (determining plaintiff's primary duty without considering the relationship between salaries where there was no evidence of subordinates' salaries because "the Court must make its decision based on all the facts in a particular case and the presence or absence of one factor is not determinative" (citing *Thomas v. Jones Rests., Inc.*, 64 F. Supp. 2d 1205, 1214 (M.D. Ala. 1999)); *see also Severin v. Pasha's Rests., Inc.*, No. 04-CV-21765 (WMH), 2007 U.S. Dist. LEXIS 24834, at *19–20 (S.D. Fla. Mar. 21, 2007) (determining plaintiff's primary duty without considering the relationship between salaries where there was no evidence of subordinates' salaries because "the regulations make clear that the pertinent factors are not the only factors to be considered, nor that the presence or absence of any one factor is determinative").

employee, she later denied having engaged in interviews or hiring.[17]  Plaintiff also recommended

hourly employees for promotions, and her supervisor testified that at least three individuals were

promoted based on Plaintiff's recommendations.  (Kobrynich Dep. at 64–65, 86.)  She gave

Assistant Managers performance reviews, which were considered as part of pay raise

determinations.  This evidence is sufficient to show, at the least, that Plaintiff's recommendations

regarding hiring, promotions, and pay raises were given particular weight.  *See Gellhaus v. Wal-*

*Mart Stores, Inc.*, No. 10-CV-123 (MAC), 2011 U.S. Dist. LEXIS 25582, at *27 (E.D. Tex. Mar.

10, 2011) (finding that plaintiff's suggestions regarding hiring, firing, and change of employee

status, such as performance reviews, were given particular weight where "some of [plaintiff's]

recommendations regarding hiring and changes in employee status were followed, as several of

her subordinates received pay raises based in part on [plaintiff's] review of their performance");

*Williamson v. Cook Composites & Polymers Co.*, No. 08-CV-8069 (AHM), 2009 U.S. Dist.

LEXIS 120457, at *19–20 (C.D. Cal. Dec. 7, 2009) (finding the employer gave employee's

recommendations particular weight where he prepared "performance evaluations, recommended

pay increases, and recommended a promotion that [the employer] subsequently implemented").

It is also undisputed that Plaintiff had the authority to discipline hourly employees

without supervisory approval.  Defendant had a progressive disciplinary system, whereby

employees would receive a verbal, written, and final warning prior to termination.  Plaintiff

would memorialize the disciplining of employees in counseling forms, which state the basis for

the discipline and whether it was a verbal, written, or final warning.  This three-step disciplinary

---

[17] Plaintiff also sent an e-mail to her supervisor stating that she had "hired a porter," which she explained in the following, somewhat confusing way:  "When I say I hired a porter, I meant I needed that porter for that unit." (Scott. Dep. at 188.)  Two employees also submitted affidavits stating that they had been interviewed and hired by Plaintiff.  (Cineus Decl. ¶ 2; Acevedo Decl. ¶ 2.)  Other SSP Unit Managers also stated that they interviewed and recommended employees for hire.  (Auguste Decl. ¶ 4; Rodriguez Decl. ¶ 5.)

system ultimately forms the basis for the just cause necessary to terminate a unionized, hourly employee.

Plaintiff could also suspend employees without advanced approval in extreme or dangerous circumstances; normally, however, she would recommend to her supervisor that an employee be suspended. The General Manager testified that most suspensions resulted in termination. (Kobrynich Dep. at 74.) According to the hourly employees' collective bargaining agreement, suspension with intent to terminate was the most severe action Defendant could take against a union employee prior to an investigation with union involvement. Plaintiff's authority to recommend suspensions and to initiate disciplinary process against the unionized, hourly employees is sufficient to show that her recommendations and suggestions as to changes in employment status and firing were given particular weight. *See Beauchamp v. Flex-N-Gate LLC*, 357 F. Supp. 2d 1010, 1016 (E.D. Mich. 2005) (finding that supervisors suggestions and recommendations were given "particular weight" where "[they] typically initiated the progressive disciplinary process set forth in the collective bargaining agreement that would lead to an hourly worker's discharge"); *see also Burson v. Viking Forge Corp.*, 661 F. Supp. 2d 794, 805 (N.D. Ohio 2009) ("shift supervisors initiate the disciplinary process, generally by first issuing a verbal warning to the employee"); *Rainey v. McWane, Inc.*, 552 F. Supp. 2d 626, 632 (E.D. Tex. 2008) (disciplinary process initiated by supervisor). Finally, there is no evidence in the record that the recommendations of hourly employees had any weight at all in the hiring, firing, promotion, or demotion of other employees.

On the basis of the undisputed facts and Plaintiff's own testimony, this Court concludes that Plaintiff's suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of employees were given particular weight, the fourth

and final prong of the executive exemption test. Therefore, Defendant has satisfied its burden of establishing that Plaintiff was a bona fide executive, exempt from the overtime requirements of the FLSA and New York State law, on the basis of the undisputed evidence in the record and Plaintiff's own deposition testimony. No reasonable fact-finder could find that Plaintiff was not an exempt employee under the FLSA. Accordingly, Plaintiff's FLSA and state law claims fail as a matter of law, and Defendant's motion for summary judgment is GRANTED in its entirety.

## <u>CONCLUSION</u>

For the reasons stated above, Defendant's summary judgment motion (Doc. No. 20) is GRANTED in its entirety. The Clerk of Court is directed to enter judgment in favor of Defendant and to close the case.


SO ORDERED.


Dated: Brooklyn, New York             /S/
       March  29, 2011            _____
                                        ROSLYNN R. MAUSKOPF
                                        United States District Judge